UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

GREAT LAKES TRANSPORTATION HOLDING, LLC
d/b/a/ METRO CARS,

       Plaintiff,

v.                                       Case No. 12-10497

YELLOW CAB SERVICE CORPORATION OF
FLORIDA, INC., CULLAN MEATHE, METRO         HON. AVERN COHN
CAB, LLC, METRO PRO LEASING, LLC, PALM
BEACH METRO TRANSPORTATION, LLC,
METRO TRANSIT, LLC, JACKSONVILLE
METRO TRANSPORTATION, LLC, and
PENINSULA TRANSPORTATION GROUP
ENTERPRISES, LLC,

       Defendants.

_____/

**MEMORANDUM AND ORDER DENYING PLAINTIFF'S RENEWED
MOTION FOR JUDGMENT AS A MATTER OF LAW (Doc. 146)**

**I. INTRODUCTION**

This case involves a contract dispute.  Initially, it was filed in the United States

District Court for the Southern District of Florida in February of 2010 and then transferred

to the Eastern District of Michigan in February of 2012.  It was styled by Plaintiff as a

trademark infringement case and tried to a jury in June of 2013.  During the trial, it became

clear that this case is not a trademark infringement case; it is a contract dispute between

former business partners and owners of Metro Cars, Inc. (Metro Cars), a Michigan

corporation, Cullan Meathe (Meathe) and Gregory Eaton (Eaton).  Metro Cars, now-

dissolved, provided transportation services in Michigan and was well known for its black

sedan airport shuttle transportation services.

Plaintiff Great Lakes Transportation Holding, LLC (Plaintiff) brought this case against Defendants, Meathe and his Florida companies, after Plaintiff purchased Metro Cars' assets at a qualified foreclosure auction.   After the auction, Plaintiff sought to stop Defendants from using the *METRO CARS* and *METRO CARS_FL* trademarks, which Meathe began using in connection with his Florida transportation companies while he and Eaton were partners and the owners of Metro Cars.  Defendants admitted to using the trademarks and claimed a legal right to use them.  The jury found for Defendants.

Now before the Court is Plaintiff's renewed motion for judgement as a matter of law. For the reasons that follow, the motion is DENIED.  The jury's verdict stands.

## II. BACKGROUND

This case involves a business dispute between the former owners of Metro Cars, Meathe and Eaton.  Metro Cars was formed in the 1990s as a Michigan corporation to provide for-hire transportation services in Michigan.  It was well known for providing its services at the Detroit Metropolitan Airport.  Metro Cars branded itself using the *METRO CARS* trademark.  The mark was used in Metro Cars' advertising materials and on the side of its vehicles.

Daniel Ret (Ret) was hired by Meathe and Eaton to run Metro Cars.  He became the chief executive officer (CEO) and ran the day-to-day operations.  Eaton was not involved in the management of the business.

In 2003, after Meathe met a woman in Florida who would become his wife, Jenny, he decided that he wanted to move to Florida, and to start a transportation company there. Meathe started a company and hired Ret as the CEO.  Eaton knew about the Florida operation, and he knew that Ret was the CEO; he did not express concern that Ret served

2

as CEO of both the Michigan and Florida operations.

The testimony at trial differed as to how Meathe started the Florida operation and how the operation branded using the *METRO CARS* trademark.

Meathe testified that he became aware that a company, Coach, was selling its taxicab business in Florida in 2003. (Doc. 155 at 90, Meathe Direct Test.). Meathe was interested in the business. Meathe testified that he had a lunch meeting with Eaton at the Andiamo's Restaurant in Bloomfield Hills, Michigan. (*Id.* at 91). At trial, Meathe described the lunch meeting:

> Anyhow, so we ended up having lunch. It was like 12:30, 1:00. And we sat down and we were just talking, I don't know, about my wedding plans and what I was doing, and Gregory was going through some personal things at the time with his son, which I really don't want to get into. And I said to him I want, you know, an opportunity to go to Florida and buy these transportation businesses in Florida, and I said do you want to be part of the deal? I'm happy to include you. And he said I can't swing it at this time, I've got other stuff going on. I said, well, if the opportunity presents itself, then, you know, we can talk about it some other time.

(*Id.* at 92).

Meathe testified that he discussed use of the name *METRO CARS* with Eaton:

Q. During this conversation was anything regarding use of the name discussed?
A. Yes.
Q. And what was discussed?
A. That I was going to buy these transportation businesses in Florida, and I wanted to use *METRO CARS* in Florida, just in Florida.
Q. And what did he say to that?
A. No problem. It's yours – I mean you and I built that together. What's yours is mine, what's mine is yours. You know, it was like not a big deal. So I took him for his word.
Q. Did he demand any payment for it?
A. No.
Q. Did he demand any payment in the future for it?
A. No.
Q. Did he put a limit on how long you could us it?
A. He told me succinctly that I could operate it forever, that was his words, free of charge, okay?

3

Q. And did he ever say "but I can pull it back if I want"?
A. No.
Q. Or words to that effect?
A. No, he wouldn't have said that.

(*Id.* at 94–95).

After the meeting at Andiamo's, Meathe testified that he met with Jenny and discussed the conversation he had over lunch with Eaton. (*Id.* at 99–100). Meathe and Jenny drafted a letter to Eaton thanking him for his blessing in allowing them to start taxicab companies in Florida. The letter, dated December 2, 2003, was sent to Eaton at his home in Lansing. The letter was an exhibit at trial. *See* (Defs'. Ex. 2; Pl's. Ex. 25).

However, Eaton's testimony was to the contrary. Eaton testified that he never met with Meathe at Andiamo's. (Doc. 153 at 86, Eaton Direct Test.). He testified that he knew that Meathe was looking to move to Florida because he "heard rumors that they were looking at doing some stuff in Florida, but I [Eaton] didn't have any conversations with them." (*Id.*). Eaton did not discuss the rumors with Meathe. (*Id.* at 125, Eaton Cross Exam.).

Eaton testified that he did not know that Meathe wanted to buy Florida companies and run them without him until he received Meathe's and Jenny's letter. After Eaton received the letter, he testified that he was hurt, but he eventually let it go and "wished him [Meathe] the best." (*Id.* at 87, Eaton Direct Test.). Eaton testified that he did not follow up with Meathe regarding the letter although Meathe, in the letter, wanted to formally acknowledge his appreciation for Eaton's blessing of his request to purchase taxicab operations in Florida. (*Id.* at 131, Eaton Cross Exam.).

The jury obviously found Meathe's version of the meeting credible.

Eaton testified that he first learned that Meathe was using Metro Cars' name in Florida sometime in the mid-2000s when he was visiting in Florida. (*Id.* at 92, Eaton Direct Test.). When Eaton was going to dinner at the Ritz Carlton in Sarasota, he saw a Michigan car with a Michigan license plate and it had a *METRO CARS* sign on it. (*Id.* at 95). Meathe testified that all of the vehicles originally used in Florida were brought from Michigan to Florida. (Doc. 155 at 112, Meathe Direct Test.). Eaton testified that this was the first time that he learned that Meathe was using the *METRO CARS* trademark in connection with his Florida companies. At trial, Eaton also stated:

> Q. What did you do next?
> A. I called Mr. Ret and screamed at him and asked him, I asked him – no, I didn't scream at him, I'm sorry, I just asked him what's a car from Michigan doing in Florida?
> Q. What did he say to you?
> A. Didn't you talk to Cullan?
> Q. And?
> A. No, I said no.
> Q. What happened next?
> A. When I came back, me and Cullan had a discussion about it, and he said, you know, I guess that's not fair, you know, and he says, well, I'll pay 10,000 a month to you for the use of the name in Florida.

(Doc.153 at 95–96, Eaton Direct Test.).

The companies, though separately owned and operating in different states, were very much related. Not only was Ret the CEO of both companies, but Metro Cars also advertised that its services were available in Florida. These advertisements were referring to Meathe's companies.

In 2007, Metro Cars was looking to sell the Michigan operation. Metro Cars entered into a Letter of Understanding with Checker Sedan Co. (Checker), a company interested in purchasing the Michigan operation. The Letter of Understanding dated October 31, 2007

5

was executed by and among Eaton, Meathe, and Checker's vice president. (Ex. 69). One

of the terms in the Letter of Understanding read as follows:

> Purchaser [Checker] shall enter into a perpetual, royalty free licence with Cullan F.
> Meathe or his designee to use the service marks "Metro Cars" and "Metro Cars FL"
> within the State of Florida.

Eaton was asked specifically about the Letter of Understanding at trial:

> Q. Okay. This is the Checker Cab letter of intent to purchase Metro Cars, Inc., the
> Michigan companies only. . . .
> A. Right.
> Q. Okay. And did you, did you meet with the Checker people prior to this offer being
> made?
> A. Prior to?
> Q. Yes.
> A. We met – I met with them, but I don't know what date it was.
> * * * *
> Q. . . . This offer was signed as acknowledging by you, correct?
> A. Yes.
> Q. At the end, and Mr. Meathe, right?
> A. Yes.
> Q. And this is – you are probably familiar, but I can point out the language to you.
> This agreement says if the sale is completed, which it never was, but if the sale is
> completed, then Mr. Meathe would have exactly what I just related to you about
> what we say the oral agreement is that you had with Mr. Meathe?
> A. Yes.
> * * * *
> Q. This language about Mr. Meathe being able to use METRO CARS and METRO
> CARS$_{FL}$ in Florida only in perpetuity, forever, noncancelable, without a royalty, this
> language in this letter of intent was meant to maintain the status quo if the Michigan
> companies were sold, right?
> A. Yes.

(Doc. 154 at 37–38, Eaton Cross Exam).

At the end of 2005, Metro Cars' commercial liability insurance was up for renewal.

To satisfy the insurance company that Metro Cars was a separate and distinct entity from

Meathe's Florida companies, Ret worked with Dykema Gossett, PLLC (Dykema) attorney

Charlie Rutherford, attorney for the Metro Cars Michigan operation, to draw up a trademark

6

agreement allowing the Florida companies to use *METRO CARS*<sub>FL</sub> in Florida.  (Doc. 152 at 139, Ret Court Exam.).  Ret signed the agreement on behalf of Metro Cars.  Gary Wilson (Wilson), the attorney for the Florida companies, signed on behalf of the Florida companies at Ret's direction.  The terms of the agreement were not discussed with Eaton or Meathe.  In fact, both Eaton and Meathe testified that the first time they saw the agreement was at their depositions during the course of discovery.  The agreement purported to provide the Florida companies with "a non-exclusive, nontransferable, royalty-free license in the State of Florida only, to use the Mark -METRO CARS FL-. . . ."  However, it stated that it was cancelable at will with 14 days' notice.

The Michigan and Florida companies defaulted on their financial obligations and, by 2009, the lender bank initiated foreclosure proceedings on both companies.  Eventually, Plaintiff purchased the assets of Metro Cars at a qualified auction and Defendant Peninsula Transportation Group Enterprises, LLC (PTG) purchased the assets of the Florida companies in a judicial foreclosure.  Why the lender took a different course in foreclosing on its collateral was not explained at trial.

After Plaintiff acquired Metro Cars' assets, a letter was sent to Meathe and the Florida companies on November 23, 2009 by Plaintiff's lawyer, Jill Wheaton (Wheaton), to notify the addressee to cease using the *METRO CARS* and *METRO CARS*<sub>FL</sub> trademarks within 14 days.  Before this letter, Eaton never told Meathe to stop using the *METRO CARS* and *METRO CARS*<sub>FL</sub> trademarks.  (Doc. 154 at 35–36, Eaton Cross Exam.).  At trial, Eaton testified:

> Q. And you knew that Mr. Meathe was using METRO CARS and METRO CARS<sub>FL</sub> in Florida, right?
> A. At that time, yes.

Q. And you knew that the Michigan companies weren't using METRO CARSFL right?
A. Yes.
Q. Only METRO CARS?
A. Yes.
Q. Okay. And your feeling was – you didn't say anything, if this occurred in 2004, you didn't say anything, right?
A. No, because the two companies we were trying to sell so why mess up the water when, you know, we're trying to sell both companies so I figured let it roll.

(Doc. 154 at 34–35, Eaton Cross Exam.).  When Defendants refused to stop using the trademarks after receiving the Wheaton letter, Plaintiff filed this action.

The trial focused on whether Defendants were given permission to use the *METRO CARS* and *METRO CARSFL* trademarks and, if so, whether there were any limitations to such use.

At the end of Plaintiff's case in chief, Plaintiff and Defendants each moved for judgment as a matter of law.  Defendant also moved to dismiss Meathe individually.  The motions were taken under advisement.

Before the case was submitted to the jury, the Court held as a matter of law that the written license agreement had no efficacy.  The Court explained its rationale:

**THE COURT:** That license was signed by Mr. Ret, who was general manager of both companies.  That license was signed by Mr. [Wilson], who was a representative of both companies.  Neither of the principals under the evidence in the case was aware of the license in their deposition testimony.  Therefore, the license in the Court's view has no efficacy and was not intended to be an instrument to govern the rights of the parties because [Wilson] and Ret owed a fiduciary duty to each of the parties and they could not on their own decide what they did in that license, and that was the basis for the Court awarding a partial judgment as a matter of law on the issue of the written license, that it did not govern the rights of the parties, and indeed, when the license was terminated by Ms. – I keep forgetting her name.

**MR. SMITH:** Ms. Wheaton

**THE COURT:** – Wheaton she made no reference to the written agreement, and to the extent that the written agreement featured in this case at any time it was a red herring, and the energy and time devoted to the written agreement in this case I

8

believe, if you had a mean judge, would sanction the parties under I think it's 28
U.S.C. 1929 for excessiveness.

Now do I make the Court's position clear?

(Doc. 157 at 23–24).

At the close of proofs, Plaintiff renewed its motion for judgment as a matter of law.
The Court took it under advisement.  Defendants renewed their motion to dismiss Meathe
individually.  The Court denied the motion.

Also, it is important to note that during the course of the trial the Court was advised
that Meathe no longer was using the trademarks *METRO CARS* or *METRO CARS*FL.  The
parties stipulated, and showed the jury the stipulation, that the trademarks were used from
November 23, 2009 until March 12, 2013.  (Doc. 131 at 2, Joint Stipulation).

On June 21, 2013, the case was submitted to the jury.  The jury rendered a verdict
for Defendants the same day.  The form of verdict completed by the jury read as follows:

The parties do not dispute that Plaintiff's predecessor Metro Cars, Inc. granted a
license to the Yellow Cab Defendants and Defendant Meathe to use the marks
METRO CARS or METRO CARS FL in Florida.  The parties disagree as to the
terms of the license.

Plaintiff says that the license was terminable at will.

Defendants say that the license was perpetual.

**WE, THE JURY** return the following verdict:

1. Do you find that the license could be terminated? NO

(Doc. 139, Jury Verdict Form).

The balance of the verdict form which the jury did not reach is attached as Exhibit
A.

On July 18, 2013, Plaintiff filed a renewed motion for judgment as a matter of law

(Doc. 146).  Defendants filed a response (Doc. 161).  Plaintiff filed a reply (Doc. 162).  The motion is ready for decision.

### III. LEGAL STANDARD

Fed. R. Civ. P. 50 states:

> **(a) Judgment as a Matter of Law.**
> > **(1) *In General.*** If a party has been fully heard on an issue during a jury trial and the court finds that a reasonable jury would not have a legally sufficient evidentiary basis to find for the party on that issue, the court may:
> > > **(A)** resolve the issue against the party; and
> > > **(B)** grant a motion for judgment as a matter of law against the party on a claim or defense that, under the controlling law, can be maintained or defeated only with a favorable finding on that issue.

Fed. R. Civ. P. 50(a).

A motion for judgment as a matter of law can be renewed after trial.  Fed. R. Civ. P. 50(b).  In ruling on the renewed motion, the court has the power to (1) "allow judgment on the verdict, if the jury rendered a verdict"; (2) "order a new trial"; or (3) "direct the entry of judgment as a matter of law."  Fed. R. Civ. P. 50(b)(1)–(3).

A motion under Rule 50(b) requires the court to "disregard all evidence favorable to the moving party that the jury is not required to believe.  That is, [the court] should give credence to the evidence favoring the nonmovant as well as that evidence supporting the moving party that is uncontradicted and unimpeached, at least to the extent that that evidence comes from disinterested witnesses."  *Hall v. City of Clarksville*, 276 F. App'x 457, 463 (6th Cir. 2008) (citation and internal quotation marks omitted).  In effect, "[t]he inquiry for resolving a Rule 50 motion for judgment as a matter of law is the same as the inquiry for resolving a motion for summary judgment pursuant to Fed. R. Civ. P. 56."  *Cox v. Shelby State Cmty. Coll.*, 194 F. App'x 267, 272 (6th Cir. 2006) (citing *White v. Burlington*

10

*N. & Santa Fe Ry. Co.*, 364 F.3d 789, 794 (6th Cir. 2004) (en banc)).  This requires the court to "review the evidence in the record in the light most favorable to the nonmoving party and determine whether there was a genuine issue of material fact for the jury."  *Id.* (citation omitted).

## IV. DISCUSSION

### A. Plaintiff Invited Error, If There Was Error

Plaintiff begins by arguing that the Court erred in allowing question one on the verdict form.  As explained above, question one asked: "Do you find that the license could be terminated?"  Plaintiff argues that this question is purely legal, i.e. that the jury impermissibly decided that Defendants had a perpetual, oral license that was irrevocable. The Court disagrees that this justifies entry of judgment as a matter of law.

To the extent that question one sought a legal conclusion and was therefore in error, Plaintiff invited the error.  As the Sixth Circuit has explained, "[t]he doctrine of 'invited error' refers to the principle that a party may not complain on appeal of errors that he himself invited or provoked the court or the opposite party to commit."  *Harvis v. Roadway Exp. Inc.*, 923 F.2d 59, 60 (6th Cir. 1991) (citing 5 Am. Jur. 2d § 713 (1962)).  *See also Garza v. Ind. & Mich. Elec. Co.*, 338 F.2d 623 (6th Cir. 1964) ("One may not complain of rulings which he invited the court to make.") (citation omitted).

The Sixth Circuit explained in *Harvis*:

> The doctrine of "invited error" is a branch of the doctrine of waiver by which courts prevent a party from inducing an erroneous ruling and later seeking to profit from the legal consequences of having the ruling set aside.  It is based on reliance interests similar to those that support the doctrines of equitable and promissory estoppel. Having induced the court to rely on a particular erroneous proposition of law or fact, a party in the normal case may not at a later stage of the case use the error to set aside the immediate consequences of the error.

11

923 F.2d at 61.  The doctrine has been applied by the Sixth Circuit to affirm the denial of

a motion for judgment notwithstanding the verdict.  *Am. Anodco, Inc. v. Reynolds Metals*

*Co.*, 743 F.2d 417, 421 (6th Cir. 1984).  Courts may rely on the doctrine of invited error

unless its application would result in a "manifest injustice."  *United States v. Demmler*, 655

F.3d 451, 459 (6th Cir. 2011) (citing *Fryman v. Fed. Crop Ins. Corp.*, 936 F.2d 244, 251

(6th Cir. 1991)).

 The first question on the jury verdict form which Plaintiff now objects to ended up on

the form because Plaintiff requested it.  Therefore, to the extent it constituted error, it was

invited by Plaintiff and cannot be the basis for judgment as a matter of law.  This becomes

clear by tracing how question one ended up on the verdict form.

 On March 4, 2013, the Court entered a Third Amended Pretrial Order (Doc. 91).  In

this order, the Court recognized that the parties had previously lodged with the Court

witness lists, exhibit lists, draft jury instructions, and draft verdict forms.  However, because

the parties filed a Joint Stipulation of Dismissal of Certain Claims (Doc. 89) on February 27,

2013, and because the Court bifurcated trial on liability from trial on damages, it instructed

as follows:

> 3. Plaintiffs shall, within twenty (20) days, lodge with the Court a draft amended
> verdict form on liability.  Defendants shall, within (10) days thereafter, lodge
> objections, if any, to plaintiffs' verdict form, together with their proposed verdict form
> on liability.
>
> 4. Plaintiffs shall have ten (10) days to reply.
>
> 5. The Court will hold a hearing on the draft verdict forms on <u>May 7, 2013, at 11:00</u>
> <u>a.m.</u>

(Doc. 91 at 1–2, Third Amended Pretrial Order).

 Pursuant to the Court's order, Plaintiff filed an amended verdict form (Doc. 92-1).

12

Defendants also filed objections to Plaintiff's proposed amended verdict form (Doc. 93). Objections were made by Defendants to almost every question on the proposed amended verdict form. Defendants also proposed a verdict form (Doc. 93 at 7). Plaintiff filed a seventeen page reply (Doc. 94).

On May 7, 2013, the Court held a hearing on the draft verdict forms. The Court was not in a position to make a ruling on all of the objections at the hearing.

On May 24, 2013, the Court issued an Order Regarding Proposed Verdict Form (Doc. 98). The Court, among other things, resolved some of the issues relating to Plaintiff's ownership of the *METRO CARS* trademark and the affirmative defenses in the case. In a footnote, the Court stated, "[o]bviously the final verdict form must be reflective of the instructions to the jury on the law of the case." (*Id.* at 2 n.1). The Court further stated,

> [t]he parties should work together on a draft verdict form which incorporates this order as well as the jury instructions. A copy of the instructions and verdict form should be lodged with the Court prior to the May 30, 2013 final pretrial conference. If the parties cannot reach agreement a composite of the verdict form and jury instructions reflecting the parties' differences shall be submitted.

(*Id.* at 2–3).

The parties continued to work on the verdict form and jury instructions.

On June 10, 2013, Plaintiff filed an amended verdict form on liability (Doc. 118).

On June 12, 2013, Plaintiff filed proposed jury instructions (Doc. 123) and Plaintiff's third amended verdict form on liability (Doc. 124).

On June 18, 2013, Plaintiff filed a fourth amended verdict form on liability (Doc. 130).

On June 19, 2013, Plaintiff filed proposed jury instructions (Doc. 132, 133) and a fifth amended verdict form on liability (Doc. 134).

On June 20, 2013 Defendants filed proposed jury instructions (Doc. 136) and a

proposed verdict form different than Plaintiff's proposed verdict form (Doc. 135).

On June 20, the case was ready for final argument. However, the Court dismissed the jury for the day because the parties could not agree on the final jury instructions and verdict form. After the jury was dismissed, the parties worked together on the final jury instructions and verdict form. Later that afternoon, the parties agreed on a verdict form. Due to the history of disagreement between the parties, the Court directed the lawyers for the parties to initial the verdict form that would be submitted to the jury to reflect their agreement. (Doc. 157 at 15, Trial Tr.).

Later that day, at 4:52 p.m., Plaintiff emailed the Court's case manager informing her that the parties had agreed to a change on the verdict form:

> Sakna [sic], attached please find the proposed amended verdict form. The additional question is question No. 1. The rest of the form is the same except for changing the question numbers were [sic] appropriate.

> I spoke with Mr. Thomas, and he is in agreement. Thank you.

*See* (Attached Exhibit B, 6/20/2013 Email From Suzanne Hill To Case Manager).

The change, at *Plaintiff's request*, was to add what ended up as question one of the final verdict form, "Do you find that the license could be terminated?"

However, on June 21, 2013, prior to final argument, Plaintiff stated that it did not want the verdict form with the new change. Nor did Plaintiff want the verdict form it had agreed on and initialed the day before:

> **THE COURT:** Okay, fine. Are we ready for the jury?

> **MS. HILL:** The first matter, Your Honor, concerns the verdict form.

> **THE COURT:** Yeah.

> **MS. HILL:** And I understand and apologize, Your Honor, we had the

14

conference yesterday and we agreed on a verdict form and then we went to the jury instructions and the jury instructions changed, and after we had a moment to think about it, we were concerned about the verdict form that was agreed upon in that it potentially invited error on the part of the jury to make a legal determination regarding whether the oral license could be perpetual. We thought about it, and we proposed another instruction. We submitted that yesterday, another verdict form, but we think that verdict form probably should not be used. That invites an opportunity for error, where if the jury answers the first question and there's a legal determination made afterwards, we don't get answers to the following questions, which would potentially result in a new trial. We think the problem – so the second verdict form that we submitted yesterday we think needs to be disregarded, we apologize for that, but the problem –

**THE COURT:** You now have a third verdict form?

**MR. SMITH:** No.

**MS. HILL:** No. The problem –

**THE COURT:** Well, wait a second. I'm about to start final argument, and you are telling me that the verdict form you agreed upon you don't want that you initialed. The verdict form you agreed upon yesterday now you don't want, so you want something else, but you don't have the something else to give me?

**MS. HILL:** Well, Your Honor –

**THE COURT:** Just answer my – is that a fair assessment? Is that a fair assessment? That you now say you don't want the first verdict form, that's the one you initialed, you don't want the second verdict form, which is the one you transmitted to the case manager yesterday afternoon, and you want a third verdict form, but you don't have the form? Just answer yes or no.

**MS. HILL:** No.

**THE COURT:** Well, where is the third verdict form that you want?

**MS. HILL:** I would suggest we go back to the one that we submitted, which is Document 134 on June 19th.

**THE COURT:** I don't know about 134. I haven't followed what you've filed. I have the form that you initialed and the one you transmitted by email. Now, which of the two do you want? Just tell me which of the two.

**MS. HILL:** Well, Your Honor, between the two of those I would suggest –

**THE COURT:** I didn't ask between the two of those. I asked you a direct question. This is A and this is B. Do you want A or B?

**MS. HILL**: Neither.

**THE COURT:** Then what is it you want?

**MS. HILL:** I would want the verdict form that is Document 134 that we submitted on June 19th of 2013.

**THE COURT:** Mr. Thomas?

**MR. THOMAS:** Your Honor –

**THE COURT:** Yes or no.

**MR. THOMAS:** No, we want the verdict form that was approved yesterday when we –

**THE COURT:** You initialed?

**MR. THOMAS:** No, no. There's another one that we agreed to that has the new question. [Mr. Thomas was referring to the verdict form that was transmitted to the case manager on June 20 which contained Question 1 that Plaintiff now says was submitted to the jury in error].

**THE COURT:** All right. That's the verdict form. I'm bringing in the jury. I'm done with the verdict form. You agreed to it, and you are going to have to abide by it. This is not a rolling, rolling case.

(Doc. 158 at 3–7).

At the eleventh hour, Plaintiff argued that the Court should revert back to a verdict form filed by Plaintiff on June 19 (Doc. 134) which was not agreed to by Defendants and which was subsequently changed. The parties continued to make changes to the verdict form and instructions after Doc. 134 was filed. Plaintiff did not want the Court to use a verdict form that its lawyer had initialed the day before. Ultimately, with the case ready for final argument, and having already sent the jury home the day before due to the parties' disagreement over the verdict form and jury instructions, the Court used the latest verdict

16

form that the parties had agreed on.  This was the verdict form that was transmitted by email to the case manager.  It was Plaintiff who suggested adding the first question to the final verdict form.  Thus, it cannot claim error to a question it suggested be submitted to the jury.

To the extent that Plaintiff complained about the question being on the verdict form prior to it being submitted to the jury, its complaint came too late.  The Court sent the jury home on the prior day because the parties were at an impasse regarding the jury verdict form and instructions.  After agreeing and initialing an approved jury verdict form, the parties agreed, at Plaintiff's request, to change the first question.  Plaintiff's last minute complaint that it did not want either of the jury verdict forms it had approved would have led to another impermissible delay in the trial.  The Court exercised its discretion in using a jury verdict form approved by the parties less than 24 hours earlier–a jury verdict form Plaintiff itself suggested be used.  *Geders v. United States*, 425 U.S. 80, 86 (1976) ("The trial judge must meet situations as they arise and to do this must have broad power to cope with the complexities and contingencies inherent in the adversary process."); *Deary v. City of Gloucester*, 9 F.3d 191, 194–95 (1st Cir. 1993) ("The trial judge has discretion to maintain the pace of trial, and indeed 'has the responsibility to oversee the conduct of a trial so that it moves expeditiously. . .' Trial judges need to maintain strict control over judicial proceedings. . . .") (citation omitted); *Cranberg v. Consumers Union of U.S., Inc.*, 756 F.2d 382, 391 ("The conduct of a fair trial is vested in the sound discretion of the trial judge. . . [A]s a common law judge, he has an overall responsibility to see that the trial is just and not subject to delay.") (citations and internal quotation marks omitted).

Therefore, to the extent that question one, which the jury answered in the negative,

17

calls for a legal conclusion not appropriate to be put to the jury, Plaintiff invited the error and the jury's verdict will not be disregarded on this basis.  *See Harvis*, *supra*, 923 F.2d at 60.

## B. Even if the Invited Error Doctrine Does Not Apply, Plaintiff is Not Entitled to Judgment as a Matter of Law

### 1. The written license agreement does not have any efficacy

Plaintiff argues that the written license agreement, which the Court decided was unenforceable as a matter of law, see *supra* at 8–9, is valid and enforceable and supercedes any oral agreement.  Thus, Plaintiff says that after Defendants received the Wheaton termination letter, their continued use of the marks constituted trademark infringement.  The Court will spend little time revisiting this issue.  At trial, it became clear that the written license agreement was approved by Ret on behalf of Metro Cars with himself and on behalf of the Florida companies with himself.   Wilson was a mere functionary under Ret's control and direction when he signed on behalf of the Florida companies.  Ret admitted this when responding to questioning by the Court:

> **THE COURT:** Did you subsequently then discuss the terms and conditions of that license with Mr. Meathe?
>
> **THE WITNESS:** No.
>
> **THE COURT:** So you went forward, you felt you had the authority to go forward.  So the terms and conditions within the license as reflected were the terms and conditions that were satisfactory to you?
>
> **THE WITNESS:** Yes.
>
> **THE COURT:** But they weren't discussed with Mr. Meathe?
>
> **THE WITNESS:** No.

* * * *

18

**THE COURT:** All right.  Did you discuss with [Eaton] the terms and conditions of that license agreement?

**THE WITNESS:** I discussed with him that his oral agreement was going to go into a written agreement, and he was very irate that he still had not gotten paid by Mr. Meathe.

**THE COURT:** Beyond that though, did you discuss the terms of the license agreement?

**THE WITNESS:** No.

**THE COURT:** Subsequently, so that when you signed it the substantive terms were terms that were satisfactory to you?

**THE WITNESS:** To me and the attorney that drew it up, correct.

(Doc. 152 at 139–141, Ret Testimony).

Although Ret had authority to bind Metro Cars and Wilson had, at a minimum, apparent authority to bind the Florida companies in the ordinary course of business, Ret and Wilson violated fiduciary responsibilities to the principles when they each acted on his own in a situation where the Michigan and Florida companies had conflicting interests.  The failure to disclose the written agreement to Meathe and to Eaton in advance of signing it makes it inoperable as between the parties.  In other words, the written agreement was never intended to govern the relationship between the parties.

To repeat, it is clear that Ret and Wilson breached their fiduciary duties when they, in effect, signed a license agreement that worked to bind the two companies with conflicting interests without telling either one.  "When a fiduciary relationship exists, the fiduciary has a duty to act for the benefit of the principal regarding matters within the scope of the relationship."  *Prentis Family Found. v. Barbara Ann Karmanos Cancer Inst.*, 266 Mich. App. 39, 43 (2005) (citing *Teadt v. Lutheran Church Mo. Synod*, 237 Mich. App. 567, 581

(1999)).  Indeed, the fiduciary "is not permitted to act for himself at his principal's expense during the course of his agency."  *Id.* at 49 (citation and internal quotation mark omitted).

In addition, each of the principles testified that they had never seen the agreement until their depositions in 2011.  Eaton and Meathe both testified that they did not agree to the terms of the written agreement, nor would they have agreed to such terms.  Rather, each testified to a different version of the initial agreement.  Plaintiff's attempt to revive the written agreement in support of its position is without merit.

**2. The oral agreement satisfies the statute of frauds**

Plaintiff argues that the jury could not legally find that an oral agreement between Meathe and Eaton was not terminable.  To the extent that this is a legal question, the Court finds that the oral agreement satisfies the statute of frauds and the evidence at trial supports a finding that the agreement continued in perpetuity.

The statute of frauds states:

Sec. 2. (1) In the following cases an agreement, contract or promise is void unless that agreement, contract, or promise, or a note or memorandum of the agreement, contract, or promise is in writing and signed with an authorized signature by the party to be charged with the agreement, contract or promise:

(a) An agreement that, by its terms, is not to be performed within 1 year from the making of the agreement.

Mich. Comp. Laws § 566.132.

Here, a "note or memorandum" of the oral agreement existed and was signed by both Meathe and Eaton.  As explained above, when Metro Cars entered into a Letter of Understanding with Checker, the following provision was included:

Purchaser [Checker] shall enter into a perpetual, royalty free licence with Cullan F. Meathe or his designee to use the service marks "Metro Cars" and "Metro Cars FL" within the State of Florida.

20

Both Eaton and Meathe testified at trial that this language was included in the Letter of Understanding to "maintain the status quo," i.e., to give effect to the oral agreement by continuing to allow Meathe or his designee to use the service marks "Metro Cars" and "Metro Cars FL" within the State of Florida royalty free, forever.  (Doc. 154 at 37–38, Eaton Cross Exam; Doc. 156 at 19, Meathe Direct Test.).

Assuming Michigan law governs, the statute of frauds is satisfied if "[s]ome note or memorandum having substantial probative value in establishing the contract . . .exist[s]." *Opdyke Inv. Co. v. Norris Grain Co.*, 413 Mich. 354 (1982) (citation omitted).  "[I]ts sufficiency in attaining the purpose of the statute depends in each case upon the setting in which it is found." *Id.* (citation omitted).  Here, the Letter of Understanding clearly evidences the oral agreement.  Thus, under the circumstances, the Letter of Understanding is a "memorandum" sufficient to satisfy the statute of frauds.

In addition, the writing requirement can be dispensed altogether because Eaton admitted to the oral agreement during trial.  Effectively, Eaton's testimony that the Checker agreement maintained the status quo is an admission by him that the parties orally agreed that Meathe or his designee had a perpetual, royalty free licence to use the service marks *METRO CARS* and *METRO CARS*FL in Florida.  Eaton's admission to the oral agreement under oath during trial dispenses of the writing requirement under the statute of frauds. *Adams-Riker, Inc. v. Nightingale*, 383 A.2d 1042, 1044 (R.I. 1978) ("[A] party's in-court testimony admitting terms essential to the validity of the contract may supplement an otherwise incomplete memorandum and provide a basis for enforcing the contract."); *Wernhoff v. Investors Mgmt. Corp. of Am.*, 528 A.2d 1205, 1207 (D.C. App. 1987) ("We have held that an in-court admission that an oral agreement exists constitutes a waiver to

21

the statute of frauds defense.") (citations omitted); *Wolf v. Crosby*, 377 A.2d 22, 26 (Del. 1977) ("[T]he admissions of a party in the form of testimony constitute sufficient 'memoranda' or 'writings' under the Statute of Frauds, for recorded testimony is regarded as equivalent to signed depositions.") (citation omitted).

Therefore, sufficient evidence was introduced at trial to support the jury's finding that the oral agreement was not terminable by Plaintiff.

### 3. Plaintiff waived the argument that Defendant PTG needed a separate license

Finally, Plaintiff argues that Defendant PTG was never authorized to use the marks. Plaintiff contends that any license that was granted by Metro Cars was granted to the Florida companies that were sold to PTG at the judicial foreclosure. Thus, according to Plaintiff, any license in effect "died" with the foreclosure. This argument was waived.

Plaintiff raised this issue for the first time in this second renewed motion for judgment as a matter of law. It was not raised when Plaintiff first moved for judgment as a matter of law on June 18 at the close of its case (Doc. 155 at 17–21, Pl's. JMOL), nor was it raised when Plaintiff renewed its motion for judgment as a matter of law on June 20 prior to the case being submitted to the jury (Doc. 157 at 24, Pl's. Renewed JMOL). Therefore, Plaintiff waived the argument. *Ford v. Cnty. of Grand Traverse*, 535 F.3d 483, 491 (6th Cir. 2008) ("Because the Rule 50(b) motion is only a renewal of the preverdict motion, it can be granted only on grounds advanced in the preverdict motion."), citing Advisory Committee Note to the 2006 Amendment to Fed. R. Civ. P. 50. Indeed, "[l]imiting the availability of a post-trial judgment as a matter of law also ensures that the [Defendants'] Seventh Amendment right to a jury trial is adequately protected by 'requiring that parties raise important issues *before* the case is submitted to the jury.'" *Id.* (citations

22

omitted).  Plaintiff's failure to raise this issue before the case was submitted to the jury is fatal to its current renewed motion.

## V. CONCLUSION

This case followed a long and torturous path from the time it was filed in the Southern District of Florida on February 12, 2010 to the day of the jury verdict in the Eastern District of Michigan on June 21, 2013.  The case generated 352 docket entries in Florida and 138 docket entries in Detroit up to the verdict.  At trial, eight live witnesses testified and testimony was solicited through depositions and answers to interrogatories. A total of 51 exhibits were admitted in evidence at trial.  At the end of the day all the effort in court yielded a verdict that says Meathe had the right to use the *METRO CARS* and *METRO CARS*FL trademarks in the operation of a shuttle transportation business in Florida from November 23, 2009 through March 12, 2013, a period of approximately three years and four months.  TS Eliot describes the efforts best in the final lines of *The Hollow Men*:

> *This is the way the world ends*
> *This is the way the world ends*
> *This is the way the world ends*
> *Not with a bang but a whimper.*

SO ORDERED.

　　　　　　　　　　　　 S/Avern Cohn
　　　　　　　　　　　　UNITED STATES DISTRICT JUDGE

Dated:  October 29, 2013

I hereby certify that a copy of the foregoing document was mailed to the attorneys of record on this date, October 29, 2013, by electronic and/or ordinary mail.

　　　　　　　　　　　　 S/Sakne Chami
　　　　　　　　　　　　Case Manager, (313) 234-5160

**VERDICT**                                    Ex. A

The parties do not dispute that Plaintiff's predecessor Metro Cars, Inc. granted a license to the Yellow Cab Defendants and Defendant Meathe to use the marks METRO CARS or METRO CARS$_{FL}$ in Florida. The parties disagree as to the terms of the license.

Plaintiff says that the license was terminable at will.

Defendants say that the license was perpetual.



**WE, THE JURY** return the following verdict:

1.    Do you find that the licence could be terminated?

        Yes _____        No _✓_____

*If your answer to Question 1 is "yes", please proceed to Question 2. If your answer is "no", your verdict is for the Defendants; stop here and have the foreperson sign and date this verdict form.*

2.    Do you find that Plaintiff proved by a preponderance of the evidence that Plaintiff terminated the license?

        Yes _____        No _____

*If your answer to Question 2 is "yes", please proceed to Question 3. If your answer is "no", your verdict is for the Defendants; stop here and have the foreperson sign and date this verdict form.*

3.    On _____ Plaintiff terminated the license.
                        (date)

*Proceed to Question 4.*

4.   Do you find that the Plaintiff has proven by a preponderance of the evidence that Defendants' continued use of the marks METRO CARS and METRO CARSFL after the license was terminated constitutes infringement of Plaintiff's registered mark METRO CARS?

Yes _____        No _____

*Your deliberations are concluded; have your foreperson sign and date this verdict form.*

**s/Jury Foreperson**

**In compliance with the Privacy Policy adopted by the Judicial Conference, the verdict form with the original signature has been filed under seal.**

6-21-13

Date



Great Lakes: Amended Verdict Form
Hill, Suzanne
to:
sakne_chami

Ex. B

06/20/2013 04:52 PM
Cc:
marc, "Smith, Steve", "Hrytzay, Debbie"
Hide Details
From: "Hill, Suzanne" <shill@rumberger.com>
To: <sakne_chami@mied.uscourts.gov>,
Cc: <marc@bendurethomaslaw.com>", "Smith, Steve" <ssmith@rumberger.com>, "Hrytzay, Debbie" <dhrytzay@rumberger.com>
History: This message has been forwarded.

2 Attachments



RKC_logo.jpg  5902959_1.DOC

Sakna, attached please find the proposed amended verdict form.  The additional question is question No. 1.  The rest of the form is the same except for changing the question numbers were appropriate.

I spoke with Mr. Thomas, and he is in agreement.  Thank you.


**Suzanne Barto Hill**

**Rumberger**
KIRK & CALDWELL

**Rumberger, Kirk & Caldwell, P.A.**
**Lincoln Plaza, Suite 1400**
**300 South Orange Ave. (32801)**
**Post Office Box 1873**
**Orlando, FL  32802-1873**
**Tel: 407.872.7300**
**Fax: 407.841.2133**
**shill@rumberger.com**
**vCard**

**www.rumberger.com**
Orlando Miami Tallahassee Tampa Birmingham


***************************CONFIDENTIAL***************************
The information in this e-mail message is legally privileged and confidential information intended only for the use of the addressee(s) named above. If the reader of this message is not the intended recipient or the agent responsible to deliver it to the intended recipient, you are hereby notified that any review, copying, dissemination, distribution, forwarding or the taking of any action in reliance on the contents of this communication is prohibited.  If you have received this e-mail in error, please notify the sender as soon as possible.  In addition, please delete the erroneously received message from any device/media where the message is stored.
*******************************************************************